## Minick v. MTD Products Inc.

226

*Nicholas Mattise,* for plaintiffs.
*Mark F. McKenna,* for defendant.

MINORA, *J.,* October 26, 2005—

## I. INTRODUCTION

Currently before the court is the motion for summary judgment of the defendant, MTD Products Inc. By way of background and according to the facts as set forth by the non-movant plaintiff, the record reveals the following.

On May 8, 1991, Melinda Minick, then age 3, lost her right foot and most of the toes on her left foot when she was run over by a lawn tractor operated by her mother, Catherine Minick, while Mrs. Minick was backing up. (CM deposition pp. 25-41.)

The lawn tractor was an 11-horsepower lawn tractor with a removable 36-inch cutting deck manufactured by MTD and sold under the name Service Star. It had been purchased new by Melinda Minick's grandfather, Ivan Aten, from Nicholas Lumber, a True Value dealer. The corporate representative of MTD, Gunther Plamper, testified that this lawn tractor was manufactured between the end of 1985 and the end of 1987 or early 1988 and they made some changes by 1988 that were not on this machine. (Plamper I pp. 26-27.)

The lawn tractor had a no-cut-in-reverse (NCIR) feature, which, when connected and operational, would pre-

vent the mower blade from turning when the mower was in reverse. This safety feature had to be, and had been, disconnected when its owner, Mr. Aten, had taken apart the lawn tractor and put in a new rear end/transaxle prior to the spring of 2001. (Aten deposition pp. 32-37, 45-48.) The NCIR feature had a simple male-female connector underneath the transmission/shift cover of the tractor. It had not been reconnected when the lawn tractor was re-assembled by Robert Minick, Melinda's father, prior to May 8, 2001, and was not operational at the time of this accident. Mr. Minick testified that he was not even aware that this feature existed until after his daughter's injury. (Robert Minick deposition pp. 16-22, 28-34.)

The lawn tractor had nothing to prevent its operation if the no-cut-in-reverse (NCIR) safety feature was not operational. (Plamper I pp. 68-70.) Although this was not a situation where the NCIR feature had been intentionally disconnected and intentionally not reconnected, MTD's corporate representative, Gunther Plamper, testified that MTD had conducted a survey in 1986 to find out whether people used or did not use the NCIR feature, and found that 47.5 percent disconnected the NCIR. (Plamper I pp. 75-79.) In fact, Plamper testified that MTD began using the NCIR system in 1982 (Plamper II pp. 26-27) and MTD was aware from the very beginning that people disconnected the NCIR feature. (Plamper I p. 69.) However, despite that knowledge, MTD never changed the design of the NCIR system. (Plamper I p. 79.)

Mr. Aten testified that he did receive the owners' guide/manual with the tractor but had not had it for years before this accident, and did not think either his daughter

or son-in-law had seen it. (Aten deposition pp. 16, 28, 65.) Although both Melinda's mother and father testified that they had never seen, nor had the opportunity to read, the operator's manual, even if they had read the manual, it failed to clearly identify the NCIR feature and the importance of it being operational before operating the tractor. While the tractor did have some instructions on the transmission/gear shift cover, they also failed to identify the NCIR feature and the importance of it being operational before operating the tractor.

Catherine Minick testified that she had used her father's Service Star rider mower in 1989, in cutting her grass at their home, which they had purchased in 1989. (CM deposition pp. 12-14.) Their lot was approximately an acre with grass in front and grass to the rear. (CM deposition pp. 8-9.) She had never seen or read the instruction manual for the riding mower and no one had told her how to operate this particular one, since she had learned how to operate a riding mower when she was younger, living at her parents' house. She had not noticed whether the lawn mower cut the grass while in reverse (CM deposition pp. 41-42) and she was not aware of the NCIR feature until after this accident, although she had read the instructions present on the lawn mower itself. (CM deposition pp. 43-45.)

On March 8, 1991, she had begun cutting the grass about 11 a.m. with her two young daughters—age 3 (Melinda) and age 2—in the rear of the house by the basketball hoop. When she came to the rear of the house, her two daughters were sitting on a stone wall. She turned off the riding mower, got them off the wall and put them back over by the basketball hoop and told them to stay

there. She had then gone back to the riding mower, started it up, looked to her right and rear to check on her kids, who were still over by the basketball hoop, put the rider mower in reverse, and moved about five feet when she felt a bump, jumped off the mower, pulled Melinda out from underneath and ran toward the house with her. (CM deposition pp. 25-41.)

Robert Minick, Melinda's father, and Catherine Minick's husband, testified that he had never seen or read the instruction manual for the Service Star rider mower (Robert Minick deposition pp. 5-6), which his father-in-law, Ivan Aten, would bring back and forth. He and his wife had used it to cut their grass beginning with when they moved into their present home in 1990. (Robert Minick deposition pp. 12-14.) He had read the instructions on the mower but was not really aware of the NCIR feature. (Robert Minick deposition pp. 24, 30, 34.) He had made repairs to this rider mower, such as repairing a tie-rod, the starter solenoid and wires leading to the solenoid, but had not done anything to and did not notice the wires and connecting plugs for the safety seat and NCIR. (Robert Minick deposition pp. 24-28.) He was aware that it did cut while it was in reverse but never really paid attention to that. (Robert Minick deposition p. 23.) After the accident he went and looked at the lawn mower and spoke with the father-in-law and found that it had a NCIR feature that had been disconnected and was not operable at the time of the accident. (Robert Minick deposition pp. 16-22, 28-34.)

Ivan Aten, who owned the Service Star lawn mower, testified that he was an over-the-road truck driver and is

often gone for periods of time. Prior to the spring of 2001, he had taken apart the Service Star lawn tractor and put in a new rear end and left it apart, with the cutting deck apart from the tractor, the battery out of the tractor, the belts off and the shift area cover off. The connector for the NCIR system had been, and had to be, disconnected to take out the battery or to work on the rear end. He also said that Bob Minick had taken the lawn mower and its various parts back to his house in the early spring of 2001 to put it back together and use. (Aten deposition pp. 32-37, 45-48.) Gunther Plamper testified as the corporate representative of MTD in 1996 (Plamper I) and November 19, 2003 (Plamper II). He has been the vice president of product development and safety since 1994. Prior to that he was chief engineer of consumer products since 1970.

Seventy-five percent of MTD's gross revenues are related to the sale of rotary mowers of which half is from riding mowers. (Plamper I p. 23.) MTD had in 1986 and has roughly one-third of the riding mowers market, and in 1986 that was roughly 300,000 mowers per year. (Plamper I pp. 56-57.) Studies had shown that there were approximately 200 injuries to children per year, in and prior to 1986, from riding mower back-up incidents. (Plamper II pp. 24-26.)

Mr. Plamper had inspected this mower in August of 1994 and, based on its features, determined that it was probably produced in 1986 (based on its features it could not have been produced earlier than late 1985 and no later than 1987). (Plamper I pp. 26-27.) This model was in the 600 group which was their highest selling rider mower group. (Plamper I p. 35.)

The seat kill switch, which would stop the rider mower and the blades when the person got off the seat, had a simple male and female plug connection that had a locking device that would at least require someone to use a screwdriver to take it apart. You could not just pull it apart. (Plamper I p. 63.)

In contrast, the NCIR safety device also had a simple male and female plug connection, but without any locking device and could just be pulled apart. (Plamper I pp. 66-68.)

Again, Mr. Plamper acknowledged that the lawn tractor had nothing to prevent its operation if the NCIR safety feature was not operational (Plamper I pp. 68-70) and that MTD's survey in 1986 found that 47.5 percent disconnected the NCIR. (Plamper I pp. 75-79.) In fact, Mr. Plamper testified that MTD began using the NCIR system in 1982. (Plamper II pp. 26-27.) MTD was aware from the very beginning that people disconnected the NCIR feature. (Plamper I. p. 69.) However, despite that knowledge, MTD never changed the design of the NCIR system. (Plamper I p. 79.)

Amidst that factual background, this matter has slowly progressed through the discovery stage. Eventually, the defendant filed this instant motion for summary judgment on March 23, 2005, based on five contentions:

(1) The subject lawn tractor was substantially modified after it left defendant's custody and control.

(2) Plaintiff has failed to identify any breach of duty on the part of defendant and, therefore, is unable to maintain a negligence action.

(3) Plaintiff, Robert Minick Jr.'s, claim for breach of warranty must fail since it was brought after the four-year statute of limitations period expired.

(4) Insufficient evidence of record exists to support plaintiffs' claim for punitive damages.

(5) Sufficient evidence of record exists to establish that the accident at issue was caused solely by the negligence of Catherine Minick.

The motion for summary judgment has been thoroughly briefed and argued before the undersigned on June 14, 2005 and is now ripe for disposition.

## II. ISSUE(S)

Is the defendant, MTD Products Inc. entitled to summary judgment as a matter of law on any of the five contentions set forth above?

## III. DISCUSSION

### A. *General Standards for Summary Judgment*

Summary judgment may be granted when there is no issue of material fact and the moving party is entitled to relief as a matter of law. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Most importantly, the record must be reviewed

in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Pa.R.C.P. 1035.2; *Young v. PennDOT,* 560 Pa. 373, 744 A.2d 1276 (2000); *Murphy v. Duquesne University of The Holy Ghost,* 565 Pa. 571, 777 A.2d 418 (2001); *Downey v. Crozer-Chester Medical Center,* 817 A.2d 517 (Pa. Super. 2003); *Lackawanna Ambulance Association Inc. v. Throop Community Ambulance Association Inc.,* 106 Lacka. Jurist 96, 98 (2005).

With these general principles in mind, we now examine the defendant's specific contentions as to summary judgment.

## B. *The Substantial Change Defense*

It is true that a manufacturer or provider of a product may defend on the basis of substantial change in the product after it left the manufacturer's or provider's control. However, for the substantial change defense to be successful, the evidence must show that the injury would not have occurred if the alteration had not occurred *and* that the alteration was not foreseeable. (emphasis added) More importantly, the question of foreseeability is normally left for the jury. *Eck v. Powermatic Houdaille,* 364 Pa. Super. 178, 527 A.2d 1012 (1987); *Thompson v. Motch & Merryweather Machinery,* 358 Pa. Super. 149, 516 A.2d 1226 (1986); *D'Antona v. Hampton Grinding Wheel Company,* 225 Pa. Super. 120, 310 A.2d 307 (1973). See also, *Powell v. Drumheller,* 539 Pa. 484, 495, 653 A.2d 619, 624 (1995).

Defendant relies on *Davis v. Berwind Corp.,* 547 Pa. 260, 690 A.2d 186 (1997). However, in *Davis,* there was

no evidence that the blenders at issue in *Davis* were routinely being used without safety devices preventing the cutting blade injuries suffered in that case.

Moreover, we agree with plaintiffs that a substantial change is not a proper defense or basis for summary judgment since evidence exists for a jury to determine whether the disconnection of the NCIR system was a foreseeable change that MTD acknowledged it knew of from the very beginning, prior to its sale of this tractor. Additionally, plaintiffs have presented enough evidence to submit to a jury that the owners' manual and warnings on the tractor were inadequate concerning the existence and function of the NCIR feature and the importance of having it operational before operating the tractor.

In our case, there is evidence that 47.5 percent of users routinely disconnected the NCIR mechanism by defendant's own survey. See *Harley v. Makita USA Inc.*, 1997 WL 197936 (F. Supp. E.D. Pa. 1997) which refused to apply *Davis* for similar reasons.

Even our Supreme Court in *Phillips v. Cricket Lighters*, 576 Pa. 644, 841 A.2d 1000 (2003) called into doubt its own mixing of strict liability and negligence terminology in *Davis*, thus rendering *Davis* a tenuous case to grant summary judgment on.

Since we feel the issue of foreseeability is best left to a jury and we have doubts as to the clear meaning of *Davis*, we will resolve all doubts in favor of the non-movant and deny defendant's motion for summary judgment based on the substantial change defense. See *Lackawanna Ambulance Inc. v. Throop Community Am-*

*bulance Association Inc.,* 106 Lacka. Jurist 96, 98 (2005) and the cases cited therein.

### C. *Plaintiffs' Alleged Failure To Identify a Breach of Duty Thus Negating Their Negligence Action*

It is axiomatic that in order to maintain a negligence action, the plaintiff must show that the defendant had a duty "to conform to a certain standard of conduct"; that the defendant breached that duty; that such breach caused the injury in question; and actual loss or damage occurred. *Phillips v. Cricket Liqhters, supra.*

Plaintiffs' expert report of Joseph E. Shelley Ph.D., PE, clearly establishes a prima facie case of breach of duty which can be submitted to a jury. The crux of Dr. Shelley's report was that the design which allowed operation of the machine when the safety system was inoperable was a serious design defect which could have been rectified through the use of a simple diagnostic circuit governing the continuity of the connection or wiring of the NCIR system, so that if the wiring of the NCIR system became disconnected and the NCIR system was inoperable, the engine would stall. (See Shelley report pp. 17-18, 22-23.)

It is axiomatic that if the NCIR feature was necessary for the safe operation of the MTD mower, then and in that event, NCIR should not be easily bypassed, disconnected or nullified and resultantly unsafe operation of the mower still be mechanically allowed.

Therefore, defendants' motion for summary judgment based on an alleged failure to identify a breach of duty will be denied.

*D. Plaintiffs Concede to Defendant That Plaintiffs'
Breach of Warranty Claims Must Be Dismissed Since
They Were Not Brought Within Four Years
of the Date the Product at Issue Was Purchased
(See Plaintiffs' Brief at p. 9 and 13; 13 Pa.C.S. §2725)*

Therefore, we will dismiss plaintiffs' breach of warranty claims with prejudice.

*E. The Insufficiency of the Evidence of Record
in Regards to Punitive Damages*

In product liability cases grounded in a theory of strict liability, plaintiff may seek punitive damages as well as compensatory damages, and such punitive damages are awarded in rare instances, to punish and deter outrageous, extreme and egregious behavior. *Hutchinson v. Penske Truck Leasing Co.,* 876 A.2d 978, 983 (Pa. Super. 2005).

Ordinary negligence, involving inadvertence, mistake or error of judgment, will not support an award of punitive damages. Rather, to justify an award of punitive damages, the fact-finder must determine that the defendant acted with a culpable state of mind, *i.e.,* with evil motive or reckless indifference to the rights of others. Since a culpable state of mind is required for an award of punitive damages, evidence of the defendant's knowledge or intention is highly relevant. *Hutchinson v. Penske Truck Leasing Co.,* 876 A.2d 978, 984 (Pa. Super. 2005).

In *Hutchinson, supra,* our Superior Court ruled that to offer evidence on the "state of mind" of the defendant based on prior accidents, the plaintiff must demonstrate that the prior accidents are "substantially similar."

*Hutchinson v. Penske Truck Leasing Co.,* 876 A.2d 978, 983-88 (Pa. Super. 2005).[1]

In the case at hand, looking at the evidence in the light most favorable to non-movant plaintiffs, a jury could find that MTD was aware of the substantial incidence of injury to children from back-over accidents; that its NCIR system was being disconnected with some frequency; and that its tractors had nothing to prevent their operation if the NCIR safety feature was not operational, yet despite that knowledge, MTD never changed the design of the NCIR system.

We have carefully considered defendants' reliance on *Hutchinson,* realizing part of *Hutchinson* sets forth the rules for using the "substantial similarity test" to prove *defectiveness* not state of mind. (emphasis added) (See *Hutchinson,* 876 A.2d at 983 for instance.)

In the case at hand, plaintiffs are relying heavily on the 200 prior accidents as evidence of MTD's state of mind in their punitive damages claim. At this point the record is unclear as to the foundation necessary to send this evidence to a jury set forth above. (See footnote 1.)

---

1. "Courts have engaged in several inquires in determining whether the other accidents were sufficiently similar to the accident at issue: Was the same instrumentality involved? Did the accidents occur under the same or similar conditions or circumstances? Did the accidents occur at substantially the same place? . . . We stress that the proponent of the evidence bears the burden to establish the similarity between the other accidents and the accident at issue *before* the evidence is admitted." *Hutchinson v. Penske Truck Leasing Co.,* 873 A.2d 978, 983 (Pa. Super. 2005). (emphasis in original)

At this point, in the interest of justice, the court directs the plaintiff to address the issues set forth in *Hutchinson* by conducting supplemental discovery to determine if the "substantial similarity" test set forth by *Hutchinson* is evident in this case.

Therefore, we will deny defendant's motion for summary judgment as to punitive damages at this point without prejudice to its right to revisit this issue via a motion in limine or any other procedural vehicle. We will also allow the plaintiffs 120 days to conduct the discovery necessary to address the *Hutchinson* issue. If the plaintiffs need more time, they can request same from the court.

### F. *Defendant's Assertion That Plaintiffs' Failure To Answer Defendant's Request for Admissions 20-23 Conclusively Determines the Issue of Causation in Defendant's Favor*

The following defendant's request for admissions were not responded to by the plaintiffs:

"(20) that Catherine Minick was negligent in her operation of the subject lawn tractor on May 8, 1991, the date of the subject accident;

"(21) that but for Catherine Minick's negligent operation of the subject lawn tractor on May 8, 1991, the subject accident would not have occurred;

"(22) that Catherine Minick was negligent in her failure to supervise and properly care for minor plaintiff on May 8, 1991, the date of the subject accident; and

"(23) that had Catherine Minick properly supervised and cared for minor plaintiff on May 8, 1991, the minor plaintiff would not have been injured."

Defendants are relying on this plaintiffs' failure to respond to the above as a basis for summary judgment. This is misguided.

The law is clear that conclusions of law such as the above requests for admissions are not within the permissible scope of requests for admissions which require setting forth matters of fact. *Christian v. Pennsylvania Financial Responsibility Assigned Claims Plan,* 454 Pa. Super. 512, 686 A.2d 1 (1996), *re-argument denied, appeal denied,* 548 Pa. 678, 699 A.2d 733 (1997).

More importantly, unanswered conclusion of law type requests for admissions cannot form the basis for summary judgment. *Dwight v. Girard Medical Center,* 154 Pa. Commw. 326, 623 A.2d 913 (1993).

Therefore, defendant's request for summary judgment based on its requests for admissions 20-23 is denied.

We will issue a comprehensive order consistent with this memorandum.

ORDER

And now to wit, October 26, 2005, after due consideration of defendants' motion for summary judgment, the able written and verbal arguments of counsel, and the court's own independent research and in accordance with the foregoing memorandum, it is hereby ordered and decreed that:

(1) Summary judgment is granted as to plaintiffs' breach of warranty claims and said breach of warranty claims are dismissed with prejudice as per the parties' concurrence.

(2) Defendant's motion for summary judgment as to punitive damages is denied at this point subject to the proviso that plaintiffs conduct additional discovery addressing the "substantial similarity" factors set forth in *Hutchinson v. Penske Truck Leasing Co.*, 876 A.2d 978 (Pa. Super. 2005) in order to sustain the "state of mind" evidence necessary to continue their claim for punitive damages.

(3) Said discovery set forth in paragraph (2) above shall be completed within 120 days of the date of this order. The plaintiff may request additional time from the court if necessary.

(4) Defendant will not be prejudiced from revisiting the punitive damages issues via a motion in limine or any other procedural vehicle appropriate at the time.

(5) The remaining portions of defendant's motion for summary judgment are denied.

(6) The parties are to proceed in a manner consistent with this memorandum and order.